UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WILEY & SONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICE GLOBAL LLC and NEARSHORE INBOUND CALL EXPERTS LIMITED, <br><br> Defendants. | 25-CV-2662 (RA) <br><br> <u>OPINION AND ORDER</u> |

RONNIE ABRAMS, United States District Judge:

This case concerns the alleged breach of several contracts for collections services. Plaintiff John Wiley & Sons, Inc. ("Wiley") alleges that Defendants NICE Global LLC ("NICE Global") and Nearshore Inbound Call Experts Limited ("Nearshore," and collectively, "Defendants") breached their contractual obligations when Defendants' employee stole over $1.7 million from Wiley. The parties dispute which entity Wiley contracted with, and whether Defendants are obligated to make restitution to Wiley for this employee's actions. Wiley now brings a motion for leave to amend its First Amended Complaint to add additional allegations as to why NICE Global is liable for breach. For the reasons that follow, Wiley's motion is granted.

<h2 style="text-align:center">BACKGROUND[1]</h2>

Plaintiff Wiley brings a breach of contract action against Defendants NICE Global and Nearshore. Wiley is a publishing company which engaged Defendants to perform certain "collection services" for Wiley's customer accounts. Dkt. 41, Ex. 1 ("Proposed SAC") ¶ 15. NICE Global is a limited liability company incorporated in Delaware, and is a "service provider

---

[1] These facts are drawn from Wiley's proposed Second Amended Complaint and assumed to be true for the purpose of resolving the instant motion. *See Dunham v. City of New York*, 295 F. Supp. 3d 319, 326 (S.D.N.Y. 2018).

specializing in account management, collections, and customer communication services." *Id.* ¶ 10. Nearshore is a Jamaican company which "operates call centers in Jamaica." *Id.* ¶ 11. The two companies are affiliated, and share common owners. *Id.* ¶ 56.

The crux of this case is that an employee for one of the Defendants—it is not clear which— stole "at least $1,745,403 from Wiley's accounts" while processing refunds for Wiley's customers. *Id.* ¶ 52. Wiley alleges that this constituted a breach of the contracts governing the parties' relationship, and that Defendants are obligated to "make restitution" for the actions of this employee. *Id.* ¶ 54.

The parties dispute, however, which entity Wiley actually contracted with. In 2018, the parties entered into a Master Services Agreement to govern their relationship. Dkt. 41, Ex. 4 ("2018 MSA"). In that contract, Wiley's counterparty is named as "Nearshore Inbound Call Experts Limited a/k/a NICE Global"—which incorporates the names of both Defendants. The parties executed a new MSA in 2022, Dkt. 41, Ex. 2 ("2022 MSA"), and a statement of work in 2023, *id.*, Ex. 3 ("2023 SOW"), in which Wiley's counterparty is similarly named as "Nearshore Inbound Call Experts a/k/a NICE Global."

On Wiley's telling, it "at all times" believed that it was in contract with NICE Global, rather than Nearshore. Proposed SAC ¶ 33. It understood that NICE Global "managed and supervised the performance of Defendant Nearshore" under these contracts. *Id.* ¶ 18. Wiley points to several facts to establish that it intended to contract, and in fact did contract, with NICE Global, rather than Nearshore, in the 2018 MSA, the 2022 MSA, and the 2023 SOW. Regarding the 2022 MSA, for example, Wiley alleges that it included a "physical mailing address" for its counterparty that "previously and exclusively belonged to NICE Global." *Id.* ¶ 27. It further alleges that the employee who signed the MSA, Vince Salerno, "was only employed by NICE Global and was not

2

otherwise employed by Nearshore." *Id.* ¶ 29.  Regarding the 2023 SOW, Wiley alleges that the employee who signed it, Paul Herdsman, was the "Chief Operating Officer for both NICE Global and Nearshore."  *Id.* ¶ 30.  When the Defendants sent invoices pursuant to the 2023 SOW, they "identified only NICE Global," and Wiley made payments on these invoices to NICE Global, rather than Nearshore.  *Id.* ¶ 33.  And when Wiley asked for a "Payment Card Industry ('PCI') certification," Defendants sent a certificate bearing only NICE Global's name.  *Id.* ¶ 34.

Defendants now claim that Wiley contracted with Nearshore, rather than NICE Global. Wiley alleges that they so claim because "NICE Global left Nearshore undercapitalized in order to (attempt to) shield itself from liability," in part because "NICE Global directed that all payments under the SOWs . . . be sent to it and not Nearshore."  *Id.* ¶ 62.

After NICE Global filed a motion to dismiss, Wiley filed an Amended Complaint.  *See* Dkt. 25.  NICE Global then filed a motion to dismiss the Amended Complaint.  *See* Dkt. 28.  In response, Wiley now seeks leave to amend again and introduce new claims establishing NICE Global's liability under these contracts.  Dkt. 40 ("Pl. Mot.").  First, Wiley seeks to add allegations that NICE Global is liable for breach of these contracts under an alter-ego theory.  Next, in the alternative, Wiley seeks to allege that both NICE Global and Nearshore are directly liable as counterparties to these contracts.  And finally, Wiley seeks to add what the Court construes as a claim for reformation of the 2023 SOW, which Wiley alleges the parties "intended" to be "governed by the 2022 MSA." Proposed SAC ¶ 21.  According to Wiley, "[d]ue only to a scrivener's error, the 2023 SOW refers to the 2018 MSA as the governing agreement," and it thus seeks to reform the 2023 SOW to clarify that it is governed by the 2022 MSA.  Proposed SAC ¶¶ 21–24.

NICE Global opposed Wiley's motion, Dkt. 46 ("Def. Opp'n"), to which Wiley replied. Dkt. 47 ("Pl. Repl."). The Court requested supplemental briefing, which the parties provided. *See* Dkt. 56 ("Pl. Suppl. Br."); Dkt. 57 ("Def. Suppl. Br.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) directs that a court "should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15. Accordingly, "it is within the sound discretion of the district court whether to grant or deny leave to amend." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995).[2] "One appropriate basis for denying leave to amend is that the proposed amendment is futile." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018). Where, as here, a "cross-motion for leave to file an amended complaint is made in response to a motion to dismiss" under Rule 12(b)(6), "leave to amend will be denied as futile . . . if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). "[T]he burden of proving futility rests on the party opposing the amendment." *Coniglio v. Cucuzza*, 345 F.R.D. 372, 377 (E.D.N.Y. 2024).

In reviewing proposed amendments for futility, the Court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017). At bottom, the Court must ensure the proposed amendments plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and

---

[2] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

would "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## DISCUSSION

In broad strokes, Wiley seeks to add three new allegations to its First Amended Complaint. Wiley seeks to allege (1) that NICE Global is liable for breach of the 2023 SOW, the 2022 MSA, and the 2018 MSA under "veil-piercing and alter-ego theories" under New York law, or, alternatively, that (2) NICE Global is directly liable for breach as a party to the 2023 SOW, the 2022 MSA, and the 2018 MSA; and (3) that the 2023 SOW should be reformed so that it is governed by the 2022 MSA. Pl. Mot. at 9–15. The Court concludes that Wiley's proposed amendments related to veil-piercing and reformation would not be futile, and thus grants it leave to amend.

### I. NICE Global's Liability for Breach—Alter-Ego Theory

Wiley first seeks leave to add allegations, in Counts II and IV of the proposed SAC, that NICE Global should "be held liable" for breach of contract "under New York veil-piercing and alter-ego theories." Pl. Mot. at 13.[3]

#### A. Choice of Law

The Court must first decide what jurisdiction's law to apply to Wiley's alter-ego theory of liability. The parties consented to the application of New York law to this theory by relying on it in their submissions. *See Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*

---

[3] The proposed amendments to the FAC do not indicate the law under which this cause of action is being brought, although the parties initially assumed New York law would apply to these claims in their briefing. "Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage." *Smith v. Railworks Corp.*, 2011 WL 2016293, at *6 n.12 (S.D.N.Y. May 17, 2011). "But where the relevant facts are sufficiently clear, courts in this Circuit have engaged in choice-of-law analysis at the motion to dismiss stage." *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018). The Court will do so here—on a preliminary basis—to examine whether Wiley's proposed amendment to include these additional claims would be futile.

5

*("Passalacqua")*, 933 F.2d 131, 137 (2d Cir. 1991); *Cambridge Cap., LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 416 (S.D.N.Y. 2023) ("A party may waive a choice of law argument or give implied consent sufficient to establish a choice of law when it assumes in its briefs that a particular jurisdiction's law applies."); *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law."). Following a review of the parties' initial submissions, the Court identified that the parties had not briefed this choice-of-law issue, and directed them to submit supplemental briefs on the topic. NICE Global now contends that Jamaican law applies to any attempt to pierce Nearshore's veil, while Wiley argues for the application of New York law. Def. Suppl. Br. at 1–3; Pl. Suppl. Br. at 1–5. The Court concludes that even if NICE Global had not initially consented to the application of New York law, it has not now met its burden to show that Jamaican law applies to Wiley's proposed allegations regarding NICE Global's liability for breach of contract under an alter-ego theory. The Court will therefore apply New York law to resolve this motion.

Because this action is brought pursuant to the Court's diversity jurisdiction, it applies New York's choice-of-law principles to Wiley's claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Coudert Bros. LLP*, 673 F.3d 180, 186–87 (2d Cir. 2012). "[U]nder New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). As a result, courts in this district routinely look to the jurisdiction in which a subsidiary is incorporated to determine whether liability should be imposed on parent companies. *See, e.g., Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 346–47 (S.D.N.Y. 2013) (collecting cases); *Nat'l Gear & Piston, Inc.*

6

*v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013). Wiley alleges that Nearshore is a "limited company organized under the laws of Jamaica." Proposed SAC ¶ 11. Thus, Jamaican law may—potentially—apply to any attempt to pierce Nearshore's corporate veil and impose liability on NICE Global.

Under New York's choice of law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet Financial.Com Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). An actual conflict exists if "the applicable law from each jurisdiction provides different substantive rules" that are "relevant to the issue at hand" and which have a "significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). "To invoke a choice-of-law analysis, a party seeking application of non-forum law must demonstrate relevant substantive differences that could have a significant impact on the outcome of the case." *Arrow Lighter, Inc. v. N. Am. Capacity Ins. Co.*, 2025 WL 4353603, at *4 (E.D.N.Y. Dec. 22, 2025); *see, e.g.*, *Fin. One Pub. Co.*, 414 F.3d at 331–32; *Athena Art Fin. Corp.* v. *Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982*, 790 F. Supp. 3d 247, 279 (S.D.N.Y. 2025) ("If the party advocating a choice of law analysis fails to demonstrate an actual conflict between New York and another state's laws, no choice-of-law analysis need be undertaken."). Though the Court may conduct its own analysis of foreign law, the party claiming foreign law applies also bears the burden of providing the information needed for the Court to determine the content of foreign law. *Bigio v. Coca-Cola Co.*, 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010); *see* Fed. R. Civ. P. 44.1. "Written or oral expert testimony accompanied by extracts from various kinds of foreign legal materials remains the basic mode" of providing this information. *Bigio*, 2010 WL 3377503, at *4.

7

The parties did not submit expert testimony on Jamaican law. They appear to agree, however, that Jamaican law largely follows the common law of the United Kingdom, which permits veil piercing under certain circumstances. Nevertheless, NICE Global does "not clearly argue[] that [Jamaican] law conflicts with New York law for veil-piercing." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 438 (S.D.N.Y. 2024), *aff'd*, 2025 WL 289499 (2d Cir. Jan. 24, 2025). It also does not explicitly identify any conflicts between New York and Jamaican law on this point; the general standards it articulates as to the actual content of Jamaican law parallel those of New York. Both jurisdictions appear to center the veil-piercing inquiry on whether an individual or entity with control over a corporation has used some aspect of the corporate form to wrong a plaintiff. *Compare Int'l Hotels (Jamaica) Ltd v. Proprietors Strata Plan No. 461*, [2013] JMCA Civ 45, ¶ 65 ("Although the court confirmed that there is a limited category of cases in which it might be appropriate to pierce the corporate veil, it squarely located the jurisdiction to do so within the context of cases of abuse of a company's separate legal personality 'for the purpose of some relevant wrongdoing.'"); *with Elec. Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987) (stating that, under New York law, a plaintiff must show a defendant's "control and domination [of a corporation] was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights," to "allow a piercing of the corporate veil").

Accordingly, in the absence of a conflict between New York and Jamaican law identified by NICE Global, the party now seeking to apply Jamaican law, the Court will apply New York law to Wiley's veil-piercing claims on the instant motion for leave to amend.

### B. NICE Global's Liability

New York courts will pierce the corporate veil and hold a corporation's owners liable for a subsidiary's acts when "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) . . . such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. N.Y. State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141 (1993); *see Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 F. App'x 23, 27–28 (2d Cir. 2017) (same).[4]  This inquiry is thus focused on a corporation's specific transactions with a plaintiff.  *See TNS Holdings, Inc. v. MKI Secs. Corp.*, 92 N.Y.2d 335, 339 (1998) ("Those seeking to pierce a corporate veil of course bear a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences.").  "Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance."  *Id.*  This doctrine is a "narrow exception to the doctrine of limited liability of corporate entities" that "courts should permit . . . only under extraordinary circumstances." *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 385 (S.D.N.Y. 2023). Nevertheless, courts frequently recognize that "veil-piercing claims are fact-intensive and often not suitable for resolution on a motion to dismiss." *Tactical Infrastructure S.A. v. Apex Energy*

---

[4] Wiley articulates its claim pursuant to "New York veil-piercing and alter-ego theories," but these theories are one and the same.  The Second Circuit has stated that New York's veil-piercing test "and the *alter ego* theory . . . are indistinguishable, do not lead to different results, and should be treated as interchangeable." *Passalacqua*, 933 F.2d at 138; *see, e.g.*, *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 375 n.4 (S.D.N.Y. 2013) (similar); *In re Stage Presence, Inc.*, 592 B.R. 292, 298 (Bankr. S.D.N.Y. 2018) (similar).

*Alt. Res., Inc.*, 2025 WL 1919551, at *4 (S.D.N.Y. July 10, 2025); *see City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 799 (S.D.N.Y. 2017) (similar).

In the ordinary course, this doctrine serves to equitably strip the owner-shielding properties of the corporate form and impose direct liability on a corporation's owners for the acts of that corporation. *Palmerone v. Staples*, 195 A.D.3d 736, 739 (2d Dep't 2021); *see* H. Hansmann, R. Kraakman & R. Squire, *Law and the Rise of the Firm*, 119 Harv. L. Rev. 1335, 1339–40 (2006). Here, however, Wiley has not alleged that NICE Global has an ownership interest in Nearshore. Rather, as alleged, the two entities are horizontal affiliates which share common ownership:

> Defendants NICE Global and Nearshore share common ownership by the same four entities: ICE Venture Capital Corp., a Delaware company whose officers direct, control, and  coordinate its activities from Canada; Diesel Marketing, LLC, ("Diesel") a Florida limited liability company whose sole member is domiciled in Florida; Poogle, LLC, ("Poogle") a Florida limited liability company whose sole member is domiciled in Florida; and Just Wright, LLC, ("Just Wright") a Florida limited liability company whose sole member is domiciled in Florida.

Proposed SAC ¶ 56. Where affiliated corporations are controlled by common owners, the Second Circuit has noted that the veil-piercing doctrine may be applied, under New York law, to reach the assets of both the owners and the affiliated entities. *Passalacqua*, 933 F.2d at 139–40.

Neither Wiley nor Defendants appear to recognize this distinction in their briefing, which is focused on the relationship between NICE Global and Nearshore, rather than the relationship between the entities and their common owners. Wiley does not, consequently, appear to advance a theory that either NICE Global or Nearshore should be pierced as to their common owners, who are not named as defendants; rather, Wiley maintains that NICE Global directly exercised domination and control over Nearshore. *E.g.*, Pl. Mot. at 14 ("Wiley's proposed SAC establishes the requisite degree of control exercised by NICE Global over Nearshore."); Proposed SAC ¶ 55 ("At all times, Defendant NICE Global dominated Defendant Nearshore."). Wiley's theory is thus

10

properly conceptualized as so-called "horizontal" veil piercing, rather than the more-traditional "vertical" veil piercing. *See In re Extended Stay, Inc.*, 2020 WL 10762310, at \*36 (Bankr. S.D.N.Y. Aug. 8, 2020) (summarizing this distinction).

When two entities have common owners, some courts applying New York law have required that a plaintiff attempt to collapse these entities along ownership lines. *See Capmark*, 491 B.R. at 349 ("Where a plaintiff seeks to disregard the corporate formalities separating horizontal affiliates . . . , the veils separating each entity from the shared corporate parent must be pierced."); *Blue Bus Tours, LLC v. Gore*, 2025 WL 2816891, at \*9 n.15 (E.D.N.Y. Oct. 3, 2025) (rejecting attempt to pierce "sister companies" because "the doctrine only seeks to hold a company's owner liable"); *cf. H&R Project Assocs., Inc. v. City of Syracuse*, 289 A.D.2d 967, 968 (4th Dep't 2001) (upholding denial of veil-piercing theory in part because the entities sought to be held liable were not "owners" of the defendant). On the other hand, the New York Court of Appeals has declined to reach the question of whether "a nonshareholder could be personally liable on a theory of piercing the corporate veil," where a corporation's director "was in a position to and did dominate the corporation with respect to the transactions at issue," *Morris*, 82 N.Y.2d at 142, and the Appellate Division has indicated in dicta that alter ego liability could attach to "affiliated corporations" in addition to corporations in a "parent and subsidiary" relationship. *Sheridan Broad. Corp. v. Small*, 19 A.D.3d 331, 332 (1st Dep't 2005); *see Rivera v. Citgo Petrol. Corp.*, 181 A.D.2d 818, 819 (2d Dep't 1992) (noting that courts may "pierce the corporate veil and hold two corporations to constitute a single legal unit"). Other courts in this District, too, have permitted a veil-piercing theory of liability between two corporations, who did not have direct economic ownership of one another, to survive a motion to dismiss after finding that the veil-piercing test

11

was otherwise satisfied.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291 n.75 (S.D.N.Y. 2005).

This latter approach has been endorsed by the Second Circuit, which held, in *Freeman v. Complex Computing Co.*, that "for veil-piercing purposes[,] . . . an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner,'" and thus held liable, "notwithstanding the fact that the individual is not a shareholder of the corporation."  119 F.3d 1044, 1051 (2d Cir. 1997).  To be held liable under this theory, though, such an individual or entity must "act as though [the dominated corporation's] assets were his alone to manage and distribute." *Id.*  In essence, they must act in a way which demonstrates that they were functionally the owner of the dominated corporation.

In *Freeman*, a consultant for the corporation at issue used that corporation to "sell his intellectual product," "received the vast majority of the resulting revenues" through related-party transactions, held himself out as the owner of the corporation, never authorized distributions to shareholders, and had an option agreement with the corporation's sole shareholder under which the director "could have become the sole shareholder," at his discretion, "for a small payment." *Id.* at 1051–52.  *Freeman*, which binds this Court, stands for the proposition that a district court should not "exalt form over substance" in conducting a veil-piercing analysis.  *Id.* at 1052.  Under *Freeman*'s logic, a court should not decline to impose liability on an individual or entity that, *de facto*, exercises complete control over a dominated corporation, even if that individual or entity does not do so pursuant to an explicit ownership interest.  *Id.*; *see also Passalacqua*, 933 F.2d at 138 (observing that, under New York law, control "is the key" inquiry).

Following *Freeman*, other courts in this District have also reached the conclusion that it permits horizontal veil-piercing on an equitable ownership theory.  *See, e.g., Highland CDO*

*Opportunity Master Fund, L.P. v. Citibank N.A.*, 270 F. Supp. 3d 716, 733–34 (S.D.N.Y. 2017);

*Citibank, N.A.*, 714 F. Supp. 3d at 440 (S.D.N.Y. 2024), *aff'd*, 2025 WL 289499 (2d Cir. Jan. 24,

2025) (collecting cases).  The Court will thus permit Wiley to advance a theory of NICE Global's

alter ego liability, predicated on its alleged domination of Nearshore, under an equitable ownership

theory.

### 1.  Domination and Control

Courts applying New York law consider a set of factors in assessing whether an individual

or entity "exercises complete domination" over a corporation, including:

> (1) the absence of the [corporate] formalities . . . i.e., issuance of stock, election of
> directors, keeping of corporate records and the like, (2) inadequate capitalization,
> (3) whether funds are put in and taken out of the corporation for personal rather
> than corporate purposes, (4) overlap in ownership, officers, directors, and
> personnel, (5) common office space, address and telephone numbers of corporate
> entities, (6) the amount of business discretion displayed by the allegedly dominated
> corporation, (7) whether the related corporations deal with the dominated
> corporation at arm's length, (8) whether the corporations are treated as independent
> profit centers, (9) the payment or guarantee of debts of the dominated corporation
> by other corporations in the group, and (10) whether the corporation in question
> had property that was used by other of the corporations as if it were its own.

*Jabord, Inc. v. Beacon LLC*, 2026 WL 696904, at *4 (S.D.N.Y. Mar. 12, 2026) (quoting *Shantou*

*Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 439–40 (S.D.N.Y. 2018)).

"These factors are not exhaustive, no one factor is dispositive, and there is no set rule as to how

many of the alter ego factors must be present in order to pierce the corporate veil," *Citibank, N.A.*,

714 F. Supp. 3d at 441, which ultimately "depends on the particular facts and circumstances."

*F&R Goldfish Corp. v. Furleiter*, 210 A.D.3d 643, 645 (2d Dep't 2022).  "Domination" is therefore

"established not by [any] bright-line test, but by examination of the way a corporation functions—

whether 'the owners use the corporation as a mere device to further their personal rather than the

corporate business.'"  *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 319

13

(E.D.N.Y. 2010) (quoting *Morris*, 82 N.Y.2d at 141). Furthermore, because courts impose a "very demanding" standard to disregard the corporate form, "conclusory allegations of dominance and control will not suffice to defeat a motion to dismiss." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015); *Kaplan*, 694 F. Supp. 3d at 386 (same); *see Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014) ("[G]eneralized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking between [the entities] . . . are plainly insufficient to state a claim of alter ego status.").

Wiley points to three categories of evidence which purportedly establish NICE Global's domination and control of Nearshore. First, Wiley alleges that Nearshore and NICE Global "share common ownership," "have overlapping management," and share office space. Proposed SAC ¶¶ 27, 56, 61. Second, Wiley alleges that NICE Global intermingled funds with Nearshore by directing payments made under the 2023 SOW to NICE Global, and did so to leave "Nearshore undercapitalized in order to (attempt to) shield itself from liability." *Id.* ¶¶ 33, 62. Finally, Wiley alleges that NICE Global routinely caused Nearshore to disregard corporate formalities by representing that Nearshore was NICE Global when it contracted with Wiley. *Id.* ¶¶ 64, 79, 94.

It is true, as NICE Global observes, that "allegations of complete ownership, common officers and personnel, and shared office space are, without more, insufficient" to impose alter ego liability. *In re All Year Holdings Ltd.*, 648 B.R. 434, 449 (S.D.N.Y. 2022); *Caplan v. Dollinger*, 803 F. Supp. 3d 219, 232 (S.D.N.Y. 2025) (collecting cases). "Where, as here, the defendants are closely-held corporations, such facts are not uncommon and must be considered in the context of other factors showing domination." *Caplan*, 803 F. Supp. 3d at 232; *see Jabord*, 2026 WL 696904, at *5 (similar); *see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18

14

(2d Cir. 1996) (noting that "over-rigid preoccupation with questions of structure" is inappropriate when analyzing closely-held companies).

So too with the allegations relating to Nearshore's undercapitalization.  While relevant, they are "by no means dispositive, as one of the purposes of limited liability is to shield owners in the event of insolvency." *Jabord*, 2026 WL 696904, at *6; *see In re BH S&B Holdings LLC*, 420 B.R. 112, 137 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("[I]t is a rare instance that the veil should be pierced because of undercapitalization, because otherwise every insolvent subsidiary would have its veil pierced.").  What is clear is that, under New York law, something more than bare insolvency is required.  *See Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 206–07 (S.D.N.Y. 2010) ("[U]ndercapitalization alone is generally insufficient to warrant piercing of the corporate veil."). At times, for example, courts in this District have found allegations of undercapitalization to be more persuasive where an entity's insolvency is also "related to" the wrongdoing directed towards a plaintiff under the second prong of the test.  *Jabord*, 2026 WL 696904, at *6; *see also Tycoons Worldwide Grp.*, 721 F. Supp. 2d at 207 ("[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or . . . [for another] improper purpose").

Here, Nearshore is alleged to be undercapitalized because it has stated that it does not have sufficient funds to pay outright the $1.7 million Wiley claims in damages for the funds allegedly stolen by Defendants' employee.  Proposed SAC ¶ 63.  Wiley claims that Nearshore is unable to pay this amount, at least in part, because NICE Global directed "all payments" for work performed by Nearshore "be sent to it and not Nearshore."  *Id.* ¶¶ 62, 64.  This links Nearshore's alleged insolvency to actions taken by NICE Global and directed towards Wiley, albeit in a tenuous way.

15

Furthermore, the intermingling of corporate assets itself can support an allegation of alter ego liability where, as here, the dominating corporation is alleged to have taken funds properly belonging to the dominated corporation. *See Sysco Food Serv. of Metro N.Y., LLC v. Jekyll & Hyde, Inc.*, 2009 WL 4042758, at *3 (S.D.N.Y. Nov. 17, 2009). In *Liberty Highrise Priv. Ltd. v. Praxis Energy Agents DMCC*, for example, allegations that the dominating corporation received payments for goods supplied to a plaintiff by the dominated corporation, which the court called a "paradigmatic example of an intermingled financial transaction" from which it could "reasonably infer" that the "two entities did not engage with each other at arms-length," were, in part, sufficient to plead alter ego liability on a motion to dismiss. 531 F. Supp. 3d 854, 858, 861 (S.D.N.Y. 2021). Likewise, in *Atateks II*, the Second Circuit found that, where a corporation's sole owner diverted commission payments payable to the corporation to an affiliate, without a "commercially reasonable explanation," such "siphoning" could support a finding of "domination and control." *Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC ("Atateks II")*, 402 F. App'x 623, 625–26 & n.1 (2d Cir. 2010). And in *Passalacqua*, the Second Circuit relied in part on a finding that the owners of a group of corporations "shuffled funds from one to another of their corporations frequently with the source of the funds chosen based on which of their corporations had sufficient funds at the time, rather than on any demonstrated business purpose of the corporation that was the source of the funds" to uphold a finding of alter ego liability. 933 F.2d at 140. Wiley's allegations regarding its payments to NICE Global for services performed by Nearshore are just the kind of financial intermingling the *Liberty Highrise* and *Atateks II* courts analyzed and appear facially similar to the fund-shuffling at issue in *Passalacqua*.

Finally, New York courts have applied a theory of alter ego liability in part where the dominating person or entity is held out as the real party in interest to a transaction. *See, e.g., Tchrs.*

16

*Ins. Annuity Ass'n of Am. v. Cohen's Fashion Optical of 485 Lexington Ave. Inc.*, 45 A.D.3d 317, 318 (1st Dep't 2007); *Meachum v. Outdoor World Corp.*, 235 A.D.2d 462, 463 (2d Dep't 1997) (piercing veil where controlling defendants "held themselves out as creating, controlling, and being responsible for" the underlying enterprise).  Wiley's allegations that it thought, throughout the parties' relationship, that it was contracting with NICE Global, rather than Nearshore, are probative under this principle.

Though a close question, these allegations are sufficient to satisfy Wiley's pleading burden, at least at this stage.  Cases dismissing veil-piercing theories of liability at the pleading stage do so largely where a plaintiff has alleged "only conclusory allegations devoid of supporting factual detail," *Kaplan*, 694 F. Supp. 3d at 386; *see Indus. Water Sols., LLC v. Ravyn & Robyn Constr., LLC*, 789 F. App'x 920, 921 (2d Cir. 2020) (summary order) (similar).  But where, as here, a plaintiff has pled sufficient facts to establish an inference of complete domination and control, their theory of alter ego liability may survive a motion to dismiss.  *See, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 649 (S.D.N.Y. 2018); *Accordia Ne. Inc. v. Thesseus Int'l Asset Fund, N.V.*, 205 F. Supp. 2d 176, 182 (S.D.N.Y. 2002).

### 2.  Fraud or Wrongdoing

Wiley has also plausibly alleged that NICE Global used Nearshore "to commit a fraud or wrong that caused" Wiley "unjustly to suffer a loss."  *CBF Industria de Gusa S/A*, 316 F. Supp. 3d at 649.  This prong "can be satisfied either by showing outright fraud, or another type of wrong, such as a breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights."  *Telenor Mobile Commc'ns A.S. v. Storm LLC*, 587 F. Supp. 2d 594, 620 (S.D.N.Y. 2008).

Wiley relies on its allegations regarding NICE Global's diversion of payments due to Nearshore to argue that it has adequately pled the existence of a "fraud or wrong."  NICE Global

17

argues that Wiley has not satisfied this prong because "nothing about NICE Global's alleged dominion over Nearshore proximately caused Wiley's alleged loss," namely the "purported theft of $1.7 million by means of unauthorized 'refunds' from customers."  Def. Opp'n at 12.

NICE Global's characterization of the causation requirement here, though, is too narrow. There need only be a "causal link" between "the fraud or wrong and the plaintiff's injury."  *Drip Cap., Inc. v. JY Imps. of N.Y. Inc.*, 348 F.R.D. 536, 546 (E.D.N.Y. 2025).  That wrong can include actions taken to hinder a plaintiff's ability to recover from the dominated corporation.  On a motion to dismiss, a plaintiff advancing this theory must allege facts to demonstrate that a jury could find that the dominating company "sought to make" the dominated company judgment proof "as a means of evading its obligations" towards the plaintiff.  *CBF Industria de Gusa S/A*, 316 F. Supp. 3d at 649–50; *see Caplan*, 803 F. Supp. 3d at 236 (noting that a complaint must "assert[] sufficient facts to link" a dominating company's actions to a plaintiff's inability to recover from the dominated company).  In other words, Wiley need only allege that NICE Global transferred assets out of Nearshore in order to hinder Wiley's ability to recover from Nearshore.  It does not need to allege, as NICE Global argues, that NICE Global's domination of Nearshore caused the alleged theft.

Courts applying New York law have held that actions taken by the dominating corporation to "strip the assets" of the dominated corporation, motivated by a desire to render the subsidiary judgment proof, would constitute a "fraud or wrong" sufficient to incur alter ego liability.  *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 917 (S.D.N.Y. 1991); *see, e.g.*, *CBF Industria de Gusa S/A*, 316 F. Supp. 3d at 649; *Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co.*, 799 F. Supp. 3d 195, 245 (S.D.N.Y. 2025) ("Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of

determining whether the corporate veil should be pierced.").  In these circumstances, the plaintiff's "injury . . . is that the diverted funds are unavailable to satisfy" the dominated company's liability to the plaintiff "unless and until the veil is pierced."  *Atateks Foreign Trade Ltd. v. Priv. Label Sourcing, LLC ("Atateks I")*, 2009 WL 1803458, at *18 & n.28 (S.D.N.Y. June 23, 2009), *aff'd*, 402 F. App'x 623 (2d Cir. 2010); *Balmer v. 1716 Realty LLC*, 2008 WL 2047888, at *6 (E.D.N.Y. May 9, 2008) ("A plaintiff may be considered injured when a company is rendered unable to pay the claims against it by third parties because of another company or individual's domination of the business."); *Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 127 (E.D.N.Y. 2012) (similar).

The diversion of payments, or other asset transfers, is typically found to be sufficient to incur alter ego liability where those transfers create or deepen the insolvency of the dominated corporation.  In *Atateks I*, for example, the "wrong" was that the dominating company diverted certain commission payments away from an insolvent, dominated company which, the court found, otherwise "should have been retained" by that company.  2009 WL 1803458, at *18.  The *Atateks I* court considered the issue on summary judgment, and found the dominated company to be insolvent at the time the transfers were made, such that those transfers were also constructively fraudulent.  *Id.* at *19.  A similar factual showing was found to be sufficient in *First Keystone Consultants*, where constructively fraudulent transfers to a dominating company from an insolvent dominated company were a sufficient "wrong" to establish alter ego liability.  871 F. Supp. 2d at 127.

Here, by contrast, Wiley has not alleged facts to demonstrate that Nearshore was insolvent at the time that the transfers were made, but it has alleged that the net result of the transfers was to render Nearshore unable to compensate Wiley for the alleged theft.  Proposed SAC ¶ 63.  The

19

Court finds that allegations of this kind of injury are sufficient to satisfy this prong of the veil-piercing test, though the actual imposition of alter ego liability will ultimately depend on the factual circumstances surrounding these transfers. *See Atateks II*, 402 F. App'x 623, 626–27 (2d Cir. 2010) (upholding alter ego liability where transfers were found to have "exacerbated defendants' insolvency and rendered them less able to pay damages"); *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827–28 (3d Dep't 1995) (upholding alter ego liability where "plaintiff has been injured as a result of [the dominated company's] undercapitalization" and transfers "resulted in a judgment" against the dominated company which the dominated company "is unable to pay").

The Court is, therefore, cognizant that "a more fully developed factual record is required to determine whether [Nearshore's] corporate veil should be pierced." *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, 2022 WL 540756, at *2 (S.D.N.Y. Feb. 23, 2022); *see Tactical Infrastructure S.A.*, 2025 WL 1919551, at *4 (similar). Nevertheless, the allegations in the proposed SAC plausibly paint a picture in which NICE Global deceptively used Nearshore as an undercapitalized shell company to contract with counterparties—who thought they were contracting with NICE Global itself—while diverting the proceeds of those contracts away from Nearshore to protect NICE Global from potential judgment creditors, including Wiley. Accepting those allegations as true, Wiley's proposed amendment to bring a claim for breach of contract against NICE Global under a veil-piercing theory is not futile.

## II. NICE Global's Liability for Breach—Other Alternative Theories

The Court next turns to Wiley's proposed alternative allegations—Counts I and III of the proposed SAC—which seek to hold both NICE Global and Nearshore directly liable for breach as parties to the 2023 SOW, the 2022 MSA, and the 2018 MSA. Wiley previously pled direct liability for breach only as to Nearshore.

20

NICE Global argues that these claims are futile because both NICE Global and Nearshore cannot be directly liable for a breach of the 2023 SOW, the 2022 MSA, and the 2018 MSA because "[t]here is only one entity identified in the relevant contracts—'Nearshore Inbound Call Experts Limited a/k/a NICE Global'—not two separate parties." Def. Opp'n at 8. Because the "unambiguous language" of the contracts "reflect only one" counterparty, the argument goes, the breach claim against NICE Global fails as a matter of law. *Id.* The Court agrees with NICE Global that Wiley's proposed amendment is futile because it fails to state a claim against NICE Global for breach of contract.

NICE Global's motion, in large part, hinges on issues of contract interpretation. "On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in plaintiff[']s favor." *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, 676 F. Supp. 3d 233, 247 (S.D.N.Y. 2023). A "claim predicated on a materially ambiguous contract term is," therefore, ordinarily "not dismissible on the pleadings." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

When interpreting a contract under New York law, the "words and phrases [in the contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). "Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009). "Ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has

21

examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as understood in the particular trade or business." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). In other words, a "contract is ambiguous where reasonable minds could differ on what a term means." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996).

The Court finds that Wiley's primary theory of joint liability for breach of these contracts is contradicted by unambiguous language in the contracts. Wiley did not plead these counts in the alternative—that is, Wiley did not allege that either Nearshore is directly liable for breach, or NICE Global is directly liable for breach. Instead, Wiley pled that both "Defendants" entered into these contracts with Wiley and are thus "jointly and severally" liable for breach. Proposed SAC ¶¶ 66, 76, 91. Federal Rule of Civil Procedure 8(d)(2) "permits pleading inconsistent theories in the alternative," *2004 Stuart Moldaw Tr. v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226, 240 (S.D.N.Y. 2009), but "alleged facts that are contradictory or inconsistent are not 'well-pleaded' and should not be credited." *Xiamen ITG Grp. Corp. v. Peace Bird Trading Corp.*, 2024 WL 5399245, at *15 (E.D.N.Y. Aug. 30, 2024).

While the identity of Wiley's counterparty may be ambiguous under the language of these contracts, the number of counterparties is not. In essence, Wiley's theory is that the "a/k/a" in "Nearshore Inbound Call Experts a/k/a NICE Global" should instead be read as "and." This strikes the Court as an implausible interpretation, as on a facial reading, only one entity is named in these contracts: "Nearshore Inbound Call Experts," which is also known as "NICE Global." Indeed, these contracts further identify this entity as "Vendor," rather than "Vendors," reinforcing the reading that there is one, singular counterparty. Proposed SAC ¶ 25. Other references to "Vendor" in these contracts reinforce the reading that a single entity would fill this role. *E.g.*, 2022 MSA

¶ 6.1 (referring to "the Vendor's employees"); 2023 SOW at 1 ("Wiley has engaged the Vendor."); 2018 MSA (referring to "the Vendor" throughout).  Furthermore, the signature blocks of these contracts only have one signature for the Vendor, reiterating the idea that only one entity is being bound.

Wiley also appears to rely on a separate theory of liability to justify this amendment: that "Wiley at all times believed it was in contract with NICE Global." Proposed SAC ¶ 33; *see* Pl. Repl. at 3.  This appears to be an attempt to argue that NICE Global manifested an intent to be bound under these contracts.  Wiley does not detail this theory in its motion, but it is apparent from the face of the proposed SAC.

Under New York law, a non-signatory may nevertheless be bound under a contract where its "overall conduct reflects its intent to be bound."  *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 285 (S.D.N.Y. 2023).  This can occur where the non-signatory was "the real party in interest to the contract," "micromanaged the contract," "was heavily involved in negotiating and drafting the contract," or was otherwise the "key decision-maker."  *Mersen USA EP Corp. v. TDK Elecs. Inc.*, 594 F. Supp. 3d 570, 580 (S.D.N.Y. 2022).[5]

Wiley has alleged that "at all times," it "believed it was in contract with NICE Global" because invoices sent pursuant to the 2023 SOW identified NICE Global as the payee, and a "NICE Global employee" provided a compliance certification "bearing only NICE Global's name" during the performance of the 2023 SOW.  Proposed SAC ¶¶ 33–34.  Wiley also points to the roles of the individuals who signed these contracts.  The Proposed SAC alleges that the 2022 MSA "included

---

[5] This is conceptually distinct from alter ego liability.  In certain circumstances, a "parent corporation's intent to be bound" by another corporation's contract "is used to prove that the subsidiary is the parent corporation's alter ego," *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396–97 (S.D.N.Y. 2009).  These are two different theories of specific intent.  The alter-ego inquiry asks about the intent behind an owner's use of the corporate form, while the intent-to-be-bound inquiry asks about a corporation's intent in negotiating or performing a contract entered into by a subsidiary or affiliate.  *See Ayres v. Teleios LS Holdings DE, LLC*, 2026 WL 450701, at *13 (S.D.N.Y. Feb. 17, 2026); *In re All Year Holdings*, 645 B.R. 10, 26 (Bankr. S.D.N.Y. 2022).

a physical mailing address that previously and exclusively belonged to NICE Global." *Id.* ¶ 27.  It was signed by "Vince Salerno, an employee of NICE Global who regularly referred to himself in correspondence to Wiley as 'VP of Operations NICE Global.'" *Id.* ¶ 29.  Salerno is identified in the 2022 MSA as the "Vice President of Operations" without reference to a specific entity, 2022 MSA at 10, and Wiley pleads, "on information and belief," that Salerno "was only employed by NICE Global and was not otherwise employed by Nearshore." Proposed SAC ¶ 29.  Furthermore, the Proposed SAC alleges that the 2023 SOW was signed by Paul Herdsman, the "Chief Operating Officer for both NICE Global and Nearshore." *Id.* ¶ 30.  Herdsman is identified only as "COO" in the 2023 SOW, again without reference to a specific entity.  2023 SOW at 3.

Even viewing these allegations in the light most favorable to Wiley, it has failed to adequately plead "expressed words and deeds" by individuals with authority to bind NICE Global to establish a plausible inference that NICE Global intended to be bound.  *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009).  The most probative evidence it has offered are the representations made by Salerno and Herdsman, but it is a "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Juhua Han v. Kuni's Corp.*, 2020 WL 2614726, at *10 (S.D.N.Y. May 22, 2020) (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).  It is similarly black-letter agency law that "an agent who acts for two or more different principals does not bind all by a statement made within the scope of the agent's employment for only one of them." *Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189, 197 n.23 (S.D.N.Y. 2011).

The allegations in the proposed SAC do not plausibly establish that Salerno and Herdsman acted to bind NICE Global, rather than Nearshore, to these contracts.  Wiley's most compelling

allegation is that Salerno—a NICE Global employee—signed the 2022 MSA. Proposed SAC ¶ 29. But it provides no detail as to any of Salerno's representations to Wiley in negotiating and executing the 2022 MSA, or any facts to support Wiley's belief that Salerno was not also an employee of Nearshore. As to Herdsman, Wiley alleges no facts to establish that he was acting in his capacity as an employee of NICE Global, rather than Nearshore.

In sum, Wiley may well be able to plausibly allege that it was either in contract with NICE Global, or, in the alternative, with Nearshore, but given the unambiguous language in these contracts, it is not plausible that it directly contracted with both entities simultaneously. Furthermore, Wiley has not adequately pled that NICE Global intended to be bound by these contracts. As is, this proposed amendment is, therefore, futile because it does not state a claim against NICE Global for breach of contract.

### III. Claim that the 2022 MSA Governs the 2023 SOW

Finally, Wiley adds new allegations that it is unambiguous that the 2022 MSA, rather than the 2018 MSA, governs the 2023 SOW. Proposed SAC ¶¶ 20–24. Wiley's basic argument is as follows. On its face, the 2023 SOW states that the "Master Agreement Effective Date" is "January 26, 2018." 2023 SOW at 1. Nevertheless, "[t]he parties intended for the 2023 SOW to be governed by the 2022 MSA. Due only to a scrivener's error, the 2023 SOW refers to the 2018 MSA as the governing agreement." Proposed SAC ¶ 21. Though it is not styled as such, Wiley's proposed addition is, in essence, a new claim for the reformation of the 2023 SOW.[6] *See, e.g., 1414 APF,*

---

[6] NICE Global argues that the Court should find this claim futile because it is inadequately pled as a formal matter, pointing to the general principle that, "under the law of the State of New York, a request for the equitable relief of reformation must be contained in the pleadings as a separate cause of action and must be pleaded in detail and with particularity." *Amritraj v. Prima Donna Assocs.*, 1986 WL 13454, at *1 (S.D.N.Y. Nov. 17, 1986); *see* Def. Opp'n at 4 n.2. But "heightened pleading requirements for particular state causes of action do not apply in federal court." *Glob. View Ltd. Venture Cap. v. Great Cent. Basin Expl., L.L.C.*, 288 F. Supp. 2d 482, 484 (S.D.N.Y. 2003). Under federal pleading standards, a plaintiff "does not need to have named its cause of action to state a claim," *13391 Broadway LLC v. Vill. of Alden*, 2020 WL 7028601, at *14 (W.D.N.Y. Nov. 30, 2020), as Rule 8 only requires "a short and plain statement of the claim showing the pleader is entitled to relief," rather than a "statement of the legal theory supporting

*LLC v. Deer Stags, Inc.*, 39 A.D.3d 329, 330 (1st Dep't 2007) (noting that a claim of "scrivener's error" is really a claim for reformation of the contract); *NCCMI, Inc. v. Bersin Props., LLC*, 226 A.D.3d 88, 93–94 (1st Dep't 2024) (similar).

"Under New York law, reformation may be granted only in two circumstances: where there has been a (1) mutual mistake, or (2) unilateral mistake coupled with fraudulent concealment by the knowing party." *Winmar Co. v. Tchrs. Ins. & Annuity Ass'n of Am.*, 870 F. Supp. 524, 535 (S.D.N.Y. 1994). Wiley only alleges mutual mistake. "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986); *see also Washington v. NYC Med. Practice, P.C.*, 2021 WL 918753, at *5 (S.D.N.Y. March 10, 2021) ("Where there is no mistake about the agreement and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected."). Furthermore, the "law establishes a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties," and thus "[t]he burden of proof is on the plaintiff to establish the cause for reformation by clear and convincing evidence." *Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 390–91 (S.D.N.Y. 2014). Claims seeking the reformation of a contract are governed by Rule 9(b), under which "a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

---

the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam); *see Skinner v. Switzer*, 562 U.S. 521, 530 ("[A] claim need not pin plaintiff's claim for relief to a precise legal theory."); Fed. R. Civ. P. 8(a)(2). The "Federal Rules of Civil Procedure are designed to discourage battles over mere form of statement." *Johnson*, 574 U.S. at 11.

Wiley argues that the 2022 MSA clearly superseded the 2018 MSA, Pl. Mot. at 12, which the Court takes as an argument that any reference to the 2018 MSA could only have been the product of mutual mistake. NICE Global responds that there is "nothing in the MSAs [that] suggest[ed] that the 2022 MSA was intended to replace the 2018 MSA," and that "there is nothing inherently wrong or contradictory with having different master service agreements govern different statements of work." Def. Opp'n at 6. The Court agrees with Wiley.

"Generally, under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." *CreditSights, Inc. v. Ciasullo*, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007). "However, a subsequent contract not pertaining to precisely the same subject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *Id.*; *see A&E Television Networks, LLC v. Pivot Point Ent., LLC*, 2013 WL 1245453, at *10 (S.D.N.Y. Mar. 27, 2013) (same). To determine if a particular provision is superseded by a provision in a subsequent contract, the Court considers: (1) "whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded;" (2) "whether the two provisions have the same general purpose or address the same general rights;" and (3) "whether the two provisions can coexist or work in tandem." *Medtech Prods., Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 809 (S.D.N.Y. 2008); *see also AT&T Corp. v. Atos IT Sol'ns & Servs., Inc.*, 708 F. Supp. 3d 385, 402 (S.D.N.Y. 2023).

First, the 2022 MSA has an integration clause which appears to indicate that it supersedes the 2018 MSA, though it does not do so explicitly. Section 18.2 provides in relevant part, that: "This Agreement constitutes the entire understanding between the Parties with respect to the subject matter of this Agreement . . . The terms and conditions set out in this Agreement and SOW

27

apply to the exclusion of any other terms Vendor seeks to impose or incorporate." 2022 MSA § 18.2. Next, the 2022 MSA largely governs the same subject matter as the 2018 MSA, in that both contracts provide common terms which would govern "[e]ach SOW executed hereunder." *Id.* § 1. Most probatively, both contracts contemplate the same general categories of common terms, with explicit provisions for terms related to timeliness, acceptance criteria, confidentiality, privacy, and payment. It would be unusual, as Wiley alleges, for the parties to redraft their "Master Services Agreement," covering the same variety of common terms, without the intention of superseding their prior agreement. Proposed SAC ¶ 23. Thus, it is at least plausible that the 2022 MSA superseded the 2018 MSA, and that the parties thus could not have intended to invoke the 2018 MSA when the 2023 SOW was executed.

Wiley has also alleged facts from which the Court can infer that Defendants had a similar understanding, and thus that there was a mutual mistake of fact. Wiley pleads that the parties intentionally shortened the term of the 2022 SOW so that the subsequent SOW—the 2023 SOW— would be governed by the "new master services agreement": the 2022 MSA that the parties were actively negotiating. Proposed SAC ¶ 24. Though somewhat spare, this allegation provides at least the inference that NICE Global and/or Nearshore agreed with Wiley that the 2023 SOW should have been governed by the 2022 MSA, rather than the 2018 MSA, and that the parties were therefore operating under a mutual mistake of fact when they executed the 2023 SOW.

As a result, the Court finds that Wiley's proposed amendment to add a claim to reform the 2023 SOW is not futile.

## IV.    Scope of Amendment

The Court thus concludes that Wiley's proposed amendment is not futile because the proposed Second Amended Complaint would not be "subject to immediate dismissal" for failure

to state a claim. *Jones v. N.Y. Div. of Mil. & Naval Affs.*, 166 F.3d 45, 55 (2d Cir. 1999); *see Princeton Restoration Corp. v. Int'l Fid. Ins. Co.*, 338 F. Supp. 2d 391, 394 (E.D.N.Y. 2004) ("[A] proposed amended complaint will not be considered futile unless it appears beyond doubt that plaintiff could prove no set of facts entitling him to relief."). Thus, pursuant to Local Civil Rule 15.1, Wiley may file the proposed Second Amended Complaint within thirty days of the date of this Opinion and Order.

In the alternative, Wiley may file a new Second Amended Complaint. Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has indicated that district courts should permit plaintiffs to amend a complaint with "the benefit of a ruling" on its adequacy, so that they may "weigh the practicality and possible means of curing specific deficiencies," if no proper grounds for denial of leave to amend have been identified. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015); *see Obra Pia Ltd. v. Seagrape Invs. LLC*, 2021 WL 1978545, at *6 (S.D.N.Y. May 18, 2021) ("[A] plaintiff should ordinarily be given the opportunity to amend after learning from the district court in what respect[s] the complaint is deficient."). Thus, if it wishes, Wiley may revise its proposed Second Amended Complaint and file the new version within thirty days of the date of this Opinion and Order. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244–45 (2d Cir. 2007) (noting that a "district court, as an exercise of its broad discretion concerning the pleadings, may consider whether to allow the already-submitted proposed amended complaint or allow submission of another one."). The Court expects that any such amendment will be the final one and address the specific deficiencies identified in this Opinion and Order.

## CONCLUSION

The Court thus grants Wiley's motion for leave to amend. Wiley shall file a Second Amended Complaint within thirty days of this Opinion and Order. NICE Global's motion to dismiss the Complaint, Dkt. 19, and motion to dismiss the First Amended Complaint, Dkt. 28, are denied as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 19, Dkt. 28, and Dkt. 39.

Dated:    March 31, 2026
          New York, New York

Ronnie Abrams
United States District Judge